IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RANDY M., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20-cv-3912 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey I. Cummings |
| KILOLO KIJAKAZI,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Randy M. ("Claimant") moves to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIBs") and Supplemental Security Income ("SSI"). The Commissioner filed a response seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons herein, Claimant's motion to reverse the decision of the Commissioner, (Dckt. #18), is granted and the Commissioner's motion to uphold the decision to deny benefits, (Dckt. #23), is denied.

I.   BACKGROUND

   A.   Procedural History

Claimant filed an SSI application on September 7, 2016, and a DIBs application on July 31, 2017, both alleging a disability onset date of June 15, 2016, due to limitations stemming from

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by his first name and the first initial of his last name. Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

1

high blood pressure and a traumatic injury to the neck and back sustained during a car accident. (R. 197). Claimant's application was denied initially and upon reconsideration. (R. 15). He filed a timely request for a hearing, which was held on May 9, 2019, before Administrative Law Judge ("ALJ") Roxanne J. Kelsey. (R. 30-47). Claimant appeared with counsel and offered testimony at the hearing. A vocational expert also offered testimony. On June 13, 2019, the ALJ issued a written decision denying Claimant's application for benefits. (R. 12-29). Claimant filed a timely request for review with the Appeals Council. The Appeals Council denied Claimant's request for review on May 4, 2020, (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner. This action followed.

### B. The Social Security Administration Standard to Recover Benefits

To qualify for disability benefits, a claimant must demonstrate that he is disabled. He does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). At step two, the SSA determines whether the claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. §404.1521. An impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* In other words, a physical

or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If a claimant establishes that he has one or more physical or mental impairments, the SSA then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, he is considered disabled, and the analysis concludes. If a listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess the claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work despite the limitations imposed by his impairments. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

  C. **The Evidence Presented to the ALJ**

Claimant seeks DIBs due to limitations from high blood pressure and a traumatic injury to his back and neck. (R. 197). Claimant alleges an onset date of June 15, 2016, and his date last

insured was December 31, 2021. (R. 15). Because the Court's decision relates only to Claimant's back impairment, it will limit its discussion of the evidence accordingly.

### 1. Evidence from the Medical Record

On June 15, 2016, Claimant was involved in a car accident. Shortly thereafter, he presented to the emergency room with complaints of neck stiffness. (R. 302). An x-ray of his cervical spine showed degenerative changes with facet osteoarthritis and uncovertebral osteoarthritis, mild neural foraminal narrowing bilaterally, and C1-C2 osteoarthritis. (R. 306). The degenerative changes were most prominent at C6-C7. (*Id.*). Five days later, on June 20, 2016, Claimant's treating physician, Liz A. Phillips, D.O., reported that Claimant was unable to work until further evaluation. (R. 273).

Claimant began physical therapy for cervicalgia and lumbar pain on July 19, 2016. (R. 276). In thirty sessions, he made objective improvements in range of motion, joint/soft tissue mobility and strength, and posture, which allowed him to perform "all required [activities of daily living] and functional activities." (*Id.*). Still, Claimant "continue[d] to present with impairments involving trunk [range of motion], soft tissue mobility and flexibility with residual pain," which limited his "ability to lift objects from the floor or overhead." (*Id.*). He was discharged from therapy on September 23, 2016. (*Id.*).

One month later, on October 20, 2016, an MRI of Claimant's lumbar spine revealed no evidence of disc herniation, spinal stenosis, significant foraminal narrowing, or paraspinous abnormalities. (R. 295). It showed "mild marrow edema along the superior anterior corner of the L4 vertebral body and fatty replacement of the marrow along the superior anterior corner of the L5 vertebral body which [were] probably due to mild degenerative change," but there was "no evidence of acute skeletal injury or destructive lesions involving the lumbar spine" and "no

evidence of disc herniation, spinal stenosis, or significant foraminal narrowing [was] seen at any level." (*Id.*). That same day, an MRI of Claimant's thoracic spine showed a mild left posterolateral disc bulge at the T12-L1 level. (R. 296).

Claimant began treatment with Scott E. Glaser, M.D. – a pain and rehabilitation specialist – on November 15, 2016. (R. 312). At Claimant's initial visit, he reported stiffness, rare numbness and tingling, and a limited range of motion. (*Id.*). He stated that physical activity aggravated his pain, which he rated a two out of ten at best and a seven out of ten at worst. (*Id.*). Claimant reported that the pain regularly interfered with his sleep and that his prior physical therapy had resulted in "no improvement in pain and function." (*Id.*). Claimant presented with limited extension and rotation in his cervical and lumbar spine and he was diagnosed with facet syndrome without myelopathy of the lumbar spine, cervical radiculopathy, and facet syndrome without myelopathy of the cervical spine. (R. 315). Dr. Glaser ordered bilateral facet joint injections at L3-L4, L4-L5, (*Id.*), which Claimant received on January 23, 2017, (R. 325).

Although the steroid injection gave Claimant fifty percent relief initially, it had no long-term benefit. (R. 309). On February 28, 2017, his neck pain, left finger pain, and back pain had increased, reaching a ten out of ten at worst and a six out of ten on average. (*Id.*). Claimant reported needing to sit down or lie down several times per day to control the pain. (*Id.*). Dr. Glaser administered bilateral medial nerve branch block injections at L2 through L5 and prescribed Tramadol and Cyclobenzaprine. (R. 310). Claimant received the same treatment on July 24, 2017. (R. 342). Dr. Glaser recommended that Claimant remain off work while under treatment. (R. 274).

On August 8, 2017, Claimant informed Dr. Glaser that his pain had decreased since he began receiving injections. (R. 437). Although Claimant still had some tenderness in the

cervical and lumbar spine, limited extension and rotation in the lumbar spine, and pain with physical activities, the pain was a five out of ten at worst and a four out of ten on average. (R. 437-38).

Claimant presented for an evaluation at the Illinois Spine & Scoliosis Center on October 3, 2018. (R. 534). He reported that the first epidural steroid injection had decreased his back pain by seventy-five percent for only a couple weeks, and the second injection had not helped at all. (*Id.*). Claimant described the pain as an eight out of ten at worst. (*Id.*). He noted that nothing helped, but he used over-the-counter medication on an as-needed basis. (*Id.*). The treating provider – Jason Welsch, P.A. – observed that Claimant was in no acute distress, walked with a normal gait, and could rise from a seated position and heel-toe walk without difficulty. (*Id.*). Claimant's range of motion was decreased in his cervical spine, but normal in his lumbar spine. (*Id.*). His motor strength was a five out of five, his straight leg tests were negative, and his deep tendon reflexes were one out of three. (R. 535). Welsch recommended Claimant begin physical therapy and obtain updated x-rays and MRIs of his cervical and lumbar spine "to evaluate the source of his radicular type symptoms." (*Id.*).

Claimant was evaluated at ATI physical therapy on October 12, 2018. (R. 565). Krzysztof Siemionow, M.D., noted that Claimant presented with signs and symptoms consistent with his diagnosis of cervicalgia, such as decreased range of motion, strength, and joint mobility, as well as impairments with posture. (*Id.*). Claimant reported that his deficits limited his ability to bend, empty the dishwasher, make his bed, carry objects, drive, lift objects from the floor, lift objects overhead, stand for greater than thirty minutes, and sit for lengthy periods of time. (*Id.*). Dr. Siemionow observed that Claimant had a normal gait and good lumbar mobility, but limited cervical joint mobility. (*Id.*).

Claimant was discharged from therapy on November 23, 2018, after making objective improvements with joint mobility, strength, soft tissue mobility, flexibility, and posture, but continued to present with some impairments. (R. 559). Claimant reported that his remaining impairments still limited his ability to lift overhead, stand for more than thirty minutes, and sit for lengthy periods of time. (*Id.*). Dr. Siemionow again noted that Claimant had good lumbar mobility, but some restrictions in his cervical mobility and thoracic spine mobility. (R. 560). Despite these ongoing defects, he found that Claimant had reached "maximum benefit" from physical therapy. (*Id.*).

> On October 22, 2018, an updated MRI of Claimant's lumbar spine showed:
>
> Normal lumbar curvature; disc desiccation throughout the lumbar spine; type II endplate degenerative changes at L2-3 through L5-S1; and unremarkable bone marrow signal. At the L2-3 and L3-4 level, there was a one- to two-millimeter diffuse disc protrusion with effacement of the thecal sac; hypertrophy of facet joints; and neuroforaminal narrowing without significant impingement of exiting nerve roots. At the L4-5 level there was a two-millimeter diffuse disc protrusion with effacement of the thecal sac; hypertrophy of facet joints; and disc material and facet hypertrophy causing bilateral neuroforaminal narrowing that effaces the left and right L-4 exiting nerve roots. At the L5-S1 level, there was a one- to two-millimeter diffuse disc protrusion with effacement of the thecal sac; hypertrophy of the facet joints; and neuroforaminal narrowing without significant impingement of existing nerve roots. The rest of the lumbar intervertebral discs appeared unremarkable.

(R. 547). That same day, an x-ray of Claimant's cervical spine showed restricted range of motion in flexion and extension positions. (R.537). PA Welsch reviewed these images with Claimant on November 8, 2018. (R. 532). At the appointment, Claimant demonstrated five out of five motor strength, negative straight leg tests, and one out of three deep tendon reflexes. (R. 532). He reported ongoing neck and low back pain, but denied changes in balance, coordination, dexterity, or dropping objects. (*Id.*). Welsch recommended continued therapy. (*Id.*).

On January 23, 2019, Claimant underwent a discogram of the L3-L4, L4-L5, and L5-S1 levels. (R. 543-44). He tested positive for discogenic pain at the L4-L5 level. (R. 543). On February 27, 2019, Dr. Siemionow informed Claimant that he could undergo surgery for his lower back pain, with a sixty percent chance of a positive outcome. (R. 526). Claimant said he would consider the procedure, (*Id.*), but had not had it at the time of his hearing, (R. 36).

### 2. Evidence from State Agency Consultants

State agency consultant Young-Ja Kim, M.D., reviewed Claimant's file on November 7, 2017. He found that Claimant could occasionally lift up to fifty pounds and frequently lift up to twenty-five pounds. (R. 53). He found that Claimant could stand, walk, or sit for about six hours in an eight-hour workday. (*Id.*). Dr. Kim based these exertional limitations, in part, on Claimant's June 2016 cervical spine x-ray and October 2016 MRI. (*Id.*). Dr. Kim also found that Claimant could only occasionally climb ladders, ropes, and scaffolds, and should be limited to medium work. (R. 54-55). State agency consultant James Hinchen, M.D., reviewed Claimant's file on March 14, 2018, and agreed with Dr. Kim's findings. (R. 77).

### 3. Evidence from Claimant's Testimony

At the May 9, 2019 hearing, Claimant testified that he could do laundry, wash the dishes, and shop, so long as these activities did not require much bending or twisting. (R. 35). He stated that he no longer used prescription pain medications because they caused memory loss. (R. 36). Claimant described his pain as a three or four out of ten on average and a six or seven out of ten when engaged in physical activity. (R. 37). He testified that he could occasionally lift up to twenty pounds, but it would cause discomfort and he would not want to do it regularly. (R. 37-38). He could stand for thirty minutes before becoming uncomfortable, sit for thirty minutes before needing to stand up, and walk for "extended periods." (*Id.*).

8

### D. The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. At step one, she found that Claimant had not engaged in substantial gainful activity since his alleged onset date of June 15, 2016. (R. 17). At step two, she determined that Claimant suffered from the severe impairments of cervical osteoarthritis and lumbar degenerative disc disease. (*Id.*).

At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments. (R. 19). Before turning to step four, she determined that, through his date last insured, Claimant had the RFC to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). (R. 19). She also limited Claimant to only occasional climbing of ladders, ropes, or scaffolds. (*Id.*). At step four, the ALJ found that Claimant could not perform his past relevant work as a construction worker. (R. 23). Even so, at step five, the ALJ concluded that a sufficient number of jobs existed in the national economy that Claimant could perform, including the representative jobs of dining room attendant, hand packager, and cleaner. (R. 24). As such, the ALJ found that Claimant was not disabled between his alleged onset date and the date of the decision. (R. 25).

### II. STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind

9

might accept as adequate to support a conclusion.'"  *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted).  The Commissioner's decision must also be based on the proper legal criteria and be free from legal error.  *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

     A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner.  *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413.

## III.    ANALYSIS

     Claimant essentially argues, among other things, that the ALJ: (1) impermissibly relied on the outdated opinions of state agency consultants when assessing Claimant's RFC; and (2) "played doctor" by interpreting potentially decisive medical evidence herself.  Because both of these arguments have merit, the Court finds that a remand to the SSA is warranted and it will not address Claimant's remaining arguments.  *See DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019) ("Because we determine that the ALJ did not properly evaluate DeCamp's limitations . . .

we do not address DeCamp's other arguments."). The Court's decision in this regard is not a comment on the merits of Claimant's other arguments and he is free to assert them on remand.

### A. The ALJ erred by relying on the opinions of state agency consultants who had not reviewed all of the evidence of record.

In making her RFC determination, the ALJ relied heavily on the opinions of the state agency consultants, finding them "consistent with and well supported by the evidence of the record as a whole" notwithstanding the fact that forty-one pages of evidence were introduced into the record after they had rendered their assessments. (R. 23). As explained at length below – *see* Section III(B), *infra* – the Court finds that these records contained "potentially decisive" medical evidence. As such, their submission rendered the consultants' opinions outdated and the ALJ was not permitted to rely on them when determining Claimant's RFC. *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) ("ALJs may not rely on outdated opinions of agency consultants if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.") (internal quotations and citations omitted); *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (same); *see also Mary P. v. Berryhill*, No. 17-CV-06545, 2019 WL 2491640, at *7-8 (N.D.Ill. June 14, 2019) (instructing the ALJ to "submit all the medical evidence to the state agency physicians for further review and scrutiny before making a determination that relies on their opinions").

### B. The ALJ erred by independently assessing medical evidence submitted after the state agency consultants had rendered their opinions.

Because no medical professional in the record submitted an opinion regarding Claimant's functional capacity *after* reviewing the updated records, the ALJ necessarily interpreted this new medical evidence herself. Claimant contends that by doing so, the ALJ impermissibly "played

11

doctor," and should have instead sought a medical opinion regarding what effect the evidence would have on Claimant's RFC. (Dckt. #18 at 12). The Court agrees.

The Seventh Circuit has repeatedly held that an ALJ may not "play [] doctor and interpret new and potentially decisive medical evidence without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (internal quotation marks omitted); *see also Lambert*, 896 F.3d at 774; *Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018); *Moreno*, 882 F.3d at 728. In *Kemplen v. Saul*, the Seventh Circuit summarized its prior holdings as providing the following standard: "the ALJ must seek an additional medical opinion if there is potentially decisive evidence that postdates the state agency consultant's opinion." 844 Fed.Appx. 883, 888 (7th Cir. 2021). In other words, the issue "comes down to whether the new information 'changed the picture so much that the ALJ erred by . . . evaluating [herself] the significance of [the subsequent] report.'" *Id.* (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016)).

Here, the evidence submitted after the state agency consultants' reviews of Claimant's file included: (1) notes from Claimant's physical therapist regarding Claimant's complaints of ongoing pain and functional limitations; (2) an updated MRI of Claimant's lumbar spine; (3) a discogram; and (4) a surgery recommendation from one of Claimant's treating providers. (R. 526-66). The ALJ summarized this evidence and concluded that it "did not provide any credible or objectively supported new and material information that would alter the state agency consultant's findings concerning the claimant's limitations as claimant had the same complaints as prior visits." (R. 23).

The Commissioner responds only briefly to Claimant's argument that the ALJ was not qualified to make the above determination (which constitutes half of Claimant's arguments for his appeal). Rather than addressing the relevant question – that is, was the updated medical

12

evidence "potentially decisive" – the Commissioner simply asserts that the ALJ's finding was proper because "various regulations require ALJs to evaluate medical records." (Dckt. #23 at 8) (citing 42 U.S.C. §405(b)(1); 20 C.F.R. §404.1512). While the Court agrees that ALJs are required to consider the medical record, they may not draw conclusions from evidence that is not open to layperson interpretation. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ALJ impermissibly played doctor by "summariz[ing] the results of the 2010 MRI in barely intelligible medical mumbo jumbo"); *see also William G. v. Kijakazi*, No. 20 C 5880, 2022 WL 2305323, at *5 (N.D.Ill. June 27, 2022) ("While the various regulations the Commissioner cites assign the evaluation of medical evidence to the ALJ . . . an ALJ is not permitted to 'play doctor' and make independent medical conclusions that are unsupported by medical evidence in the record.").

The Seventh Circuit has been especially critical of ALJs' attempts to deduce the meaning of complex medical documents, such as MRIs. *See Israel v. Colvin*, 840 F.3d 432, 439-440 (7th Cir. 2016) ("Because no physician in the record has opined on whether these [MRI] results are consistent with Israel's claim of disabling pain, and because the reports are replete with technical language that does not lend itself to summary conclusions, we cannot say whether the results support or undermine Israel's claim."); *Goins*, 764 F.3d at 680. Indeed, the Seventh Circuit has explicitly found that "[a]n ALJ may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about her impairments," *McHenry*, 911 F.3d at 871; *see also Akin*, 887 F.3d at 317 (same), which is exactly what the ALJ did here. (R. 23)

Furthermore, this is not a situation where the most recent and unreviewed evidence revealed only minor changes. *See Kemplen*, 844 Fed. Appx. at 887 (noting the Seventh Circuit has "upheld the denial of benefits when MRI evidence post-dating the state agency consultant's

13

report showed only mild changes in the claimants' respective conditions"). To the contrary, there are noticeable differences between the 2016 and 2018 MRIs of Claimant's lumbar spine. For example, while the October 20, 2016 MRI revealed "no evidence of paraspinous abnormalities," (R. 295), the October 22, 2018 MRI showed "disc desiccation throughout the lumbar spine," (R. 547). And where the 2016 MRI showed no evidence of significant foraminal narrowing, (R. 295), the 2018 MRI revealed neuroforaminal narrowing at the L2-3, L3-4, L4-5, and L5-S1 levels, with the L4-5 level showing bilateral neuroforaminal narrowing effacing the left and right L-4 exiting nerve roots, (R. 547). Furthermore, the 2016 MRI did not mention disc protrusion, (R. 295), which the 2018 MRI showed at the L2-3, L3-4, L4-5, and L5-S1 levels, (R. 547). Finally, the 2016 MRI indicated that there were likely mild degenerative changes at L4 and L5, (R. 295), while the 2018 MRI more definitively indicated "type II endplate degenerative changes at L2-L3, L3-L4, and L4-L," (R. 532, 547).

These differences between the 2016 and 2018 MRIs are illustrated as follows:

| **October 20, 2016 MRI** | **October 22, 2018 MRI** |
| --- | --- |
| No evidence of paraspinous abnormalities. | Disc desiccation throughout the lumbar spine. |
| No evidence of significant foraminal narrowing. | Neuroforaminal narrowing at the L2-3, L3-4, L4-5, and L5-S1 levels, with the L4-5 level showing bilateral neuroforaminal narrowing effacing the left and right L-4 exiting nerve roots. |
| No mention of disc protrusion. | Disc protrusion at the L2-3, L3-4, L4-5, and L5-S1 levels. |

| | |
|---|---|
| Mild marrow edema along the superior anterior corner of the L4 vertebral body and fatty replacement of the marrow along the superior anterior corner of the L5 vertebral body "probably" due to mild degenerative change. | Type II endplate degenerative changes at L2-L3, L3-L4, and L4-L. |

In addition, the state agency consultants did not have the opportunity to review Claimant's January 23, 2019 discogram, which revealed discogenic pain at the L4-L5 level, (R. 543), and prompted Dr. Siemionow to recommend lower back surgery, (R. 526). The fact that no medical professional had recommended surgery prior to this point casts further doubt on the ALJ's finding that the updated evidence contained no objectively supported information that would alter the consultants' findings. (R. 23).

Notably, the ALJ did not analyze any of the updated evidence. Instead, she first minimized the extent of the evidence by stating that it "was limited to primarily two visits to the physician assistant." (R. 23). She then opined – without addressing the new MRI or Dr. Siemionow's surgical recommendation – that the updated evidence "did not provide any credible or objectively supported new and material information that would alter the state agency consultant's findings concerning the claimant's limitations *as claimant had the same complaints at prior visits*." (*Id.*) (emphasis added). In essence, the ALJ seemed to suggest that *even if* the new evidence revealed significant medical changes, they were immaterial because Claimant's complaints remained the same throughout the record.

Contrary to the ALJ's finding, however, the unreviewed record shows that Claimant's subjective complaints did, in fact, vary over time. In particular, the most recent evidence reviewed by state agency consultant Dr. Hinchen on March 14, 2018, indicated that Claimant's

15

back pain had *improved* significantly due to the steroid injections Claimant had received on February 28, 2017. (R. 437). Indeed, when explaining his RFC findings, Dr. Hinchen wrote that: "[Claimant's] lower back pain has decreased. The frequency of the pain has decreased. The area of pain has decreased. Ratio of good days to bad days has increased. Overall reports of pain has decreased." (R. 72, 76). By contrast, the records submitted *after* Dr. Hinchen's review showed that the effectiveness of the injections was short-lived, subsequent injections did little to relieve Claimant's pain, and by October 3, 2018, Claimant was again reporting constant and achy pain at levels comparable to what he had reported before the injections. (R. 534) (describing his pain as an eight out of ten at worst). Accordingly, the consistency of Claimant's complaints was not a sufficient reason not to submit his updated records to medical scrutiny.

In sum: because the forty-one pages of evidence submitted after state agency review was potentially decisive, the ALJ erred by: (1) relying on the state agency consultants' outdated findings and (2) interpreting the evidence herself. This error was not harmless. *Lambert*, 896 F.3d at 776 ("An error is harmless only if we are convinced that the ALJ would reach the same result on remand."). The ALJ found that Claimant was capable of performing medium work, which involves lifting up to fifty pounds at a time; frequent lifting or carrying of objects weighing up to twenty-five pounds; frequent bending and stooping; and standing or walking, off and on, for approximately six hours per eight-hour workday. 20 CFR 404.1567(c); SSR 83-10. The ALJ made this finding despite Claimant's allegations that his back pain prohibited him from lifting heavy objects and bending, (R. 20, 35, 224, 559, 565), based on her conclusion that "the record does not contain sufficient medical evidence to support [Claimant's] assertions," (R. 20). However, the updated evidence at issue here – which revealed degenerative changes in Claimant's spine and prompted his treating physician to recommend surgery – appears to provide

support for those claims. The ALJ lacks the medical qualifications to say for certain one way or the other.

Accordingly, on remand, the ALJ should obtain a medical opinion regarding whether Claimant's back impairment – as documented in exhibit 8F – would require additional functional restrictions in his RFC.

## CONCLUSION

For the foregoing reasons, Claimant's motion to reverse the Commissioner's decision to deny him DIBs and SSI, (Dckt. #18), is granted and the Commissioner's motion to uphold the decision to deny benefits, (Dckt. #23), is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**ENTERED:** **October 5, 2022**

**Jeffrey I. Cummings**
**United States Magistrate Judge**